## JOHN P. THORP v. STATE.

No. A-2203.   Opinion Filed March 13, 1915.

(146 Pac. 915.)

APPEAL—Evidence—Sufficiency. The Criminal Court of Appeals will not reverse the judgment of the trial court upon the ground that the verdict is contrary to the evidence, when there is testimony in the record tending clearly to support the findings of the jury.

(Syllabus by the Court.)

*Appeal from County Court, Kiowa County;*
*J. S. Carpenter, Judge.*

John P. Thorp was convicted of violating the prohibitory law, and appeals. Affirmed.

*Thos. W. Conner,* for plaintiff in error.

*Smith C. Matson* and *R. McMillan,* Asst. Attys. Gen., for the State.

ARMSTRONG, J.   The plaintiff in error, John P. Thorp, was convicted at the November, 1913, term of the county court of Kiowa county, sitting at Snyder, in said county, on a charge of selling intoxicating liquor, and his punishment fixed at a fine of $50 and imprisonment in the county jail for a period of 30 days.

The only question briefed in this case is that the evidence is insufficient to sustain the verdict, and that the court, therefore, erred in not sustaining a demurrer thereto. The material testimony offered on behalf of the state was given by Witness John Gates and Deputy Sheriff Kimbrough. Gates testified, among other things, as follows:

"Q. Are you acquainted with the defendant, John Thorp? A. Yes, sir. Q. I will ask you whether or not you obtained any intoxicating liquors—or a pint of whisky—from the defendant about the 20th day of May, 1913? A. I got a pint on that day; yes, sir. Q. Tell the circumstances. A. Well, to start with, my wife is subject to rheumatism, and she has a receipt in which she takes whisky to fill it, and she asked me if I would go up town and see if I could get some whisky. I told her I didn't know. I would go and see if I could find any. And there was a fellow by the name of Hugdson that had boarded with me before that, but, at the time, was boarding at the Illinois Hotel, and he had told me three or four days before that he was going to order a gallon of whisky. So I came up to the Illinois Hotel, asked if he had any whisky, and he said, 'No, I haven't any,' but knew where I could get it, so we came up town together, and came to this wagon yard over here, and we met Mr. Thorp, and Mr. Hugdson said, 'Here is a man who can get some whisky for you,' so I handed Mr. Thorp the dollar, and went on in a stall, while Mr. Hugdson and Thorp went back, I suppose, in the wagon yard, and they came back to the stall where I was at, and Mr. Hugdson handed me the whisky. Q. That was in Kiowa county, state of Oklahoma? A. Yes, sir. Q. Do you know who was running the wagon yard at that time? A. No, sir. Q. Did you see any one else around there? A. No, sir; I don't believe so. Q. That was about the 20th day of May, 1913? A. Yes, sir."

Witness Kimbrough testified, amony other things, as follows:

"Q. What official position, if any, do you hold in Kiowa county? A. Deputy sheriff. Q. Were you deputy sheriff on or about the 20th day of May last? A. Yes, sir. Q. Do you remember the occasion on or about the day of arresting Mr. Gates with a pint of whisky? A. Yes, sir. Q. Did you see this defendant on that date? A. Yes, sir. Q. Did you see Mr. Gates and Mr. Thorp in the wagon yard known as Joe's wagon yard? A. Yes, sir. Q. You may tell the jury where you were and what you saw. A. Well, I believed they were selling whisky from the wagon yard, and— (Objected to by defendant; sustained by

the court.)    A. I saw Gates and another gentleman coming in the wagon yard, and meeting Thorp, and they stopped and talked a minute, and he took them to a box stall on the west side of the yard, and Mr. Thorp went back into the camp house of the yard, and came out, and I supposed they had something, and I followed Mr. Gates around a block, and arrested him, and took a pint of whisky from him.    Q. How far were you from the stall in which Gates went?    A. About 50 yards.    Q. Where were you watching?    A. In the warehouse to the Stofer Mercantile Company..    Q. Where is that from the wagon yard?    A. Right on the south side of it.    Q. Was there anything to obstruct your view between the warehouse and this stall?    A. No, sir.    Q. How far were you from the place where Mr. Gates and this man you speak of first met the defendant?    A. About the same distance.    Q. Was there anything to obstruct your view between them when they met there?    A. No, sir.    Q. Who was running that wagon ward at that time?    A. I don't know; Tom Chisholm and Thorpe, I suppose.    I don't know whether they had it at that time or not.    Q. Where did you say John went after he first talked to Gates?    A. Into the camp house.    Q. And Gates went on to the stall?    A. Yes, sir."

The principal testimony on behalf of the plaintiff in error was given by him.    The material portion of his testimony, taken from direct and cross-examination, is substantially as follows:

"Q. Are you acquainted with the witness John Gates?    'A. Yes, sir.    Q. Were you acquainted with Mr. Hugdson?    A. Yes, sir.    Q. The party referred to by Mr. Gates?    A. Yes, sir.    Q. Did you see these parties on or about the 20th day of May in a wagon yard here in this town?    A. I don't know the exact date, but along about that time, I think.    Q. When there, when did you first see these parties, John?    A. Well, I met Mr. Hugdson several times here in town.    Q. I mean at the time referred to by the witness Gates, did you see them together in the wagon yard about the 20th day of May, 1913?    A. Yes, sir.    Q. Tell the jury just when and where you saw them on that day.    A. They both came in the wagon yard together.    Q. What time of the day was that?    A. It was in the afternoon.    I don't recollect the exact time.    It was in the afternoon.    Q. Did you have any conversation with either of them or both of them?    A. Yes, sir.    Q. Tell the jury what occurred.    A. They both came in there together, and Mr. Hugdson taken me off, and told me Mr. Gates and him was together, and that he had a pint of whisky, and wanted the money for it.    Q. Well, what occurred

then? Where did he take you to? Was anything said between you and Mr. Gates and Mr. Hugdson about getting a pint of whisky at any time? A. I don't believe there was between Mr. Gates and me. Q. Between Mr. Hugdson and you in the presence of Gates? A. Well, Mr. Hugdson told me he had the whisky. Q. When did he tell you that? A. He told me that in the yard. Q. Where was Gates when he told you that? Was Gates present? A. I think he was. Q. Go ahead and tell it as nearly as you can, all that occurred. A. Well, we went back in the box stall, and in the yard, and taken a drink of whisky, all three of us. Q. Was that your whisky? A. No, sir. Q. Did you sell any whisky to Gates or Hugdson there? A. No, sir. Q. Did you take $1 from either of them? A. No, sir. Q. Who had this whisky? A. Hugdson had the whisky. Q. Who drank out of the pint? A. Well, I taken a drink, and Mr. Gates and Mr. Hugdson, all three of us taken a drink out of it."

Cross-examination:

"* * * Q. Now, John, you say that Hugdson told you he had some whisky, and that he had a pint of whisky, and that Gates wanted some whisky, and that he wanted $1 for a pint? When and where did he tell you this? A. He told me that in the yard. Q. Where was Gates at the time? A. I think he was with us. Q. How did he come to tell you he wanted you to help him get the $1? A. He didn't tell me he wanted the $1 out of the whisky. Q. He said Gates wanted the whisky, and he said he wanted the money for it? A. Yes, sir. Q. He said that before Gates, didn't he? A. I am not positive that Gates was there. Q. Didn't you say that Hugdson took you off when you first began to tell about this, and told you about that? Didn't you make that statement awhile ago? A. That he taken me off? Q. Yes, sir; that Hugdson took you off, and that Gates wanted some whisky, and he had a pint and wanted the money for it? A. No, I didn't say he taken me off. I told you that he said he had a pint of whisky, and wanted $1 for it. Q. Didn't you tell Mr. Conner that Hugdson took you off, and told you that he had this whisky, and Gates wanted some whisky, and he wanted the money for this pint of whisky? A. I don't recollect saying he taken me off. Q. Did you go in the camp house with him? A. No, sir. Q. Did you go in the camp house at all while they was there? A. No, sir."

Under this state of facts we are not prepared to say that there is no testimony from which the jury could legitimately conclude that the plaintiff in error was guilty. As a matter of fact,

we think the jury reached a correct conclusion under the testimony. One witness testified that he purchased the whisky from the plaintiff in error and paid him for it. Another witness testified that he saw the transaction in all its details, except the delivery of the whisky and the passing of the money. The story of the plaintiff in error is very improbable and does not bear the earmarks of implicit frankness and truth. The appeal is wholly without merit.

The judgment of the trial court is therefore affirmed.

DOYLE, P. J., concurs. FURMAN, J., absent.